IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TAMMIE R., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19 C 1360 |
| v. ) | |
| ) | Magistrate Judge Gabriel A. Fuentes |
| ANDREW M. SAUL, Commissioner ) | |
| of Social Security, [1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Tammie R.,[3] applied for Social Security benefits in October 2015, alleging a disability onset date of April 12, 2014, when she was 43 years old. (R. 220-22.) After her applications were denied initially and on reconsideration, the ALJ held a hearing on December 5, 2017. (R. 37.) On February 5, 2018, the ALJ issued an opinion denying Plaintiff's applications for benefits. (R. 16.) On January 10, 2019, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. 1-2), making the ALJ's decision the final decision of the Commissioner.

---

[1] The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On April 2, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 8.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 15.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

*Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020). Plaintiff has now moved to remand the ALJ's decision (D.E. 16), and the Commissioner has moved to affirm. (D.E. 24.)

**I.      Administrative Record**

Plaintiff last worked in December 2013, when her 18-year position as a cashier ended as Dominick's closed its stores. (R. 269.) She is morbidly obese at 5'9" tall and 290 to 302 pounds, has a history of Type II diabetes and cardiac catheterization. (*Id*.)

In June 2014, Plaintiff began treatment with orthopedic surgeon Denis Williams, M.D., for a "significant" amount of pain in her right shoulder and in her left hand, which by July 2014, was making it difficult for Plaintiff to lift her arm. (R. 462, 470.) Plaintiff's primary care physician, Tony R. Vancauwelaert, M.D., indicated Plaintiff was receiving "shots" for her shoulder pain and taking prednisone (a steroid) for rheumatoid arthritis. (R. 459.) In August 2014, despite taking ibuprofen, prednisone and applying a topical analgesic cream, Plaintiff's right shoulder pain continued, and she developed radiating left shoulder pain. (R. 456.) Plaintiff also tried physical therapy, but her shoulder pain continued. (R. 443-44, 453, 457-58.) In November 2014, Dr. Vancauwelaert noted that Plaintiff was also taking leflunomide (an immunosuppressive) for her joint pain caused by rheumatoid arthritis.[4] (R. 448.) In December, Dr. Vancauwelaert noted she had continued pain and decreased range of motion in her left shoulder. (R. 437.)

In January 2015, Plaintiff began treating with neurologist Danny S. Park, M.D., for numbness, tingling and pain in her arms. (R. 434.) Dr. Park prescribed gabapentin (for nerve pain) and ordered an EMG (electromyography) to evaluate whether Plaintiff's symptoms were caused by carpal tunnel syndrome ("CTS") (pressure on the median nerve, which runs from the forearm through a passageway in the wrist to the hand)[5] or radiculopathy (a pinched nerve root in the spinal

---

[4] Leflunomide is a "disease-modifying antirheumatic drug." https://medlineplus.gov/druginfo/meds/a600032.html.
[5] https://www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/symptoms-causes/syc-20355603.

column).[6] (R. 435.) A week later, Dr. Williams ordered an MRI of Plaintiff's cervical spine (upper spine or neck), which showed three herniated discs. (R. 432-33.)

On January 22, 2015, Plaintiff met with neurosurgeon Daniel Laich, D.O. She reported that despite taking gabapentin, the pain and numbness in her upper extremities ranged in severity from a 7 to 10, interrupting her sleep and making activities of daily living requiring raising her arms or using her hands, such as brushing her teeth and combing her hair, very painful. (R. 426-27.) On February 24, 2015, Dr. Laich performed a cervical laminectomy (surgical removal of the vertebral bone) and fusion (surgical connection of spinal bones) of C3-7.[7] (R. 417.)

At follow-up appointments in March 2015, Plaintiff told Drs. Park and Vancauwelaert that she continued to have pain, numbness and tingling in her lower arms and hands, and increased symptoms in her fingertips; the symptoms in her upper arms had improved. (R. 339, 405.) Dr. Park's examination showed decreased sensation in Plaintiff's bilateral fingertips. (R. 339.) In May and June 2015, Plaintiff told Dr. Laich that she had continued pain, numbness and tingling in her fingers and hands; he referred Plaintiff to physical therapy, but she continued to have pain, numbness and tingling in her hands, radiating up her arms to her biceps. (R. 329, 335, 388, 401.)

In September 2015, Dr. Park increased Plaintiff's dose of gabapentin and ordered an EMG and nerve conduction study of her hands, which revealed moderate to severe CTS in both wrists. (R. 329.) The neurologist recommended surgery, but Plaintiff's rheumatologist Manish Jain, M.D., wanted to wait to see if her symptoms abated by increasing her rheumatological medication, methotrexate (an immunosuppressive).[8] (R. 329, 363-64.) However, in November and December 2015, Drs. Park and Jain noted Plaintiff continued to have numbness, tingling, pain and swelling

---

[6] https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy.
[7] *See* https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/laminectomy (a laminectomy helps ease pressure on the spinal cord or the nerve roots; it "is considered only after other medical treatments have not worked.")
[8] https://medlineplus.gov/druginfo/meds/a682019.html.

3

in her hands despite wearing splints and taking increased doses of gabapentin and methotrexate. (R. 482, 520.) In October 2015, Plaintiff also complained of increased shoulder pain; orthopedic surgeon Terry Younger, M.D., found Plaintiff had limited extension, rotation and flexion of the left shoulder and moderate to severe tenderness in the acromioclavicular (AC) joint. (R. 348.)

In 2015, Plaintiff also received treatment from podiatrist Peter G. Chioros, D.P.M., for "persistent palpable pain" in her right foot; an MRI showed Plaintiff had a stress fracture, bone contusion and abnormal additional bone in her right foot, and Dr. Chioros prescribed a walking boot. (R. 373, 375.) In September 2015, Dr. Chioros found Plaintiff also had plantar fasciitis (inflammation of tissue across the bottom of the foot), capsulitis (inflamed ligaments) and a rheumatoid arthritis flare up in her right foot. (R. 364.)

In January 2016, a non-examining state agency physician reviewed the record and opined that despite severe spine disorders and CTS, Plaintiff could perform light work. (R. 64-66.) On June 2016, on reconsideration, a state agency physician further limited Plaintiff to frequent gross and occasional fine manipulation. (R. 85-86.)

In February and March 2016, Plaintiff reported increased numbness, tingling and pain in her left arm, and her gabapentin was increased. (R. 498, 552.) On March 14, 2016, Plaintiff told neurologist Jerrel Boyer, D.O., that her CTS symptoms had worsened to the point that she dropped things and had pain in her hands like electric shocks; Dr. Boyer's examination confirmed increased pain and decreased sensation. (R. 548-50.) Dr. Boyer recommended carpal tunnel surgery because Plaintiff's symptoms failed to improve with gabapentin and rheumatoid arthritis treatment. (R. 550.) Dr. Boyer performed left carpal tunnel release surgery on April 5, 2016 (R. 539); later that month, Plaintiff still had numbness, tingling and pain in her hands which caused some problems with her daily activities, but increased strength and mobility. (R. 539-40, 657.)

4

In April 2016, Plaintiff also returned to Dr. Younger for evaluation of right knee pain; her knee was moderately tender, and x-rays showed mild arthritic changes. (R. 544.) In May 2016, Plaintiff had moderate to severe pain in her knee and neck pain radiating down her back and left shoulder but she did not want a steroid injection because her blood sugar was unstable and she was about to start Humira (an immunosuppressive drug taken by injection to treat rheumatoid arthritis).[9] (R. 653.) Dr. Younger prescribed a heating pad to neck, ice and anti-inflammatories for the knee, and a corticosteroid injection once Plaintiff's blood sugars stabilized. (*Id.*)

In May 2016, plaintiff reported numbness and tingling in her feet, and Dr. Chioros's examination showed markedly decreased reflex in her right Achilles deep tendon. (R. 651.) He advised Plaintiff to wear her walking boot and opined that her foot problems were related to "uncontrolled" Type II diabetes.[10] (*Id.*) In June and July 2016, Plaintiff told Dr. Boyer she had worsening numbness, tingling and pain in her right hand and fingers despite increasing her dose of gabapentin and wearing a wrist splint. (R. 645, 649.) She requested surgery because she had "good relief" from left carpal tunnel release, other than some remaining numbness and tingling. (*Id.*) Dr. Boyer performed right carpal tunnel release surgery later that month. (R. 636, 646.)

In August 2016, Dr. Park noted Plaintiff initially did well after the surgery, but now felt some electric shocks through several of her right fingers. (R. 634.) She also had tingling in the bottom of her foot and sharp calf pains despite taking a higher dose of gabapentin. (*Id.*) An EMG of Plaintiff's legs indicated she had peripheral neuropathy and acute on chronic lumbar radiculopathy (*id.*),[11] and an MRI of Plaintiff's lumbar (lower) spine showed multilevel

---

[9] www.mayoclinic.org/drugs-supplements/adalimumab-subcutaneous-route/description/drg-20066817.
[10] In July 2016, endocrinologist Maria Olga Cardenas, M.D., noted that Plaintiff reported "diabetes control has been difficult since September 2015." (R. 641.)
[11] "Peripheral neuropathy, a result of damage to the nerves outside of the brain and spinal cord (peripheral nerves), often causes weakness, numbness and pain, usually in your hands and feet. . . . One of the most common causes is diabetes." https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061.

5

degenerative changes and moderate neural foramina stenosis.[12] (R. 589.) In October 2016, Plaintiff told Dr. Park that she had occasional pain shooting down her right leg and continued pain and numbness in her right hand unless she took a high dose of gabapentin. (R. 630.)

On November 7, 2016, Plaintiff met with rheumatologist Laura Gregg, M.D., to establish care. Plaintiff reported pain and tingling in her hands, shoulders, feet and knee, and examination showed pain and decreased strength and range of motion in her hands and wrists. (R. 833-34.) Dr. Gregg restarted Plaintiff on methotrexate.[13] (R. 835.) That month, Plaintiff also followed up with Dr. Chioros for diabetic foot care; examination showed Plaintiff's deep tendon reflexes were absent or decreased, although she ambulated with a stable gait. (R. 622.)

On January 4, 2017, Plaintiff told Dr. Park that her right hand pain had improved, but she had back pain that radiated down her right side and decreased sensation along the right side of her body; Dr. Park told her to continue taking gabapentin. (R. 618.) Later that month, Plaintiff told Dr. Gregg that her symptoms improved with methotrexate but she still had pain in her hands, shoulders, feet and knee. (R. 838-42.) In April 2017, Dr. Gregg noted an increase in Plaintiff's rheumatoid hand joint synovitis (inflammation of the membranes lining the joints) and decreased grip. (R. 847-48.) Dr. Gregg added a prescription for plaquenil (hydroxychloroquine sulfate, another immunosuppressive drug). (R. 850.)

In May 2017, Plaintiff complained to Dr. Laich of moderate cervical pain; rotating her neck or bending forward triggered the pain. (R. 604.) Plaintiff's cervical range of motion was decreased due to pain but otherwise normal. (R. 723.) Dr. Laich prescribed physical therapy, medication, biofreeze rub and rest for the pain. (R. 606, 721.)

---

[12] "Spinal stenosis is narrowing of the spinal column that causes pressure on the spinal cord, or narrowing of the openings (called neural foramina) where spinal nerves leave the spinal column." https://medlineplus.gov/ency/article/000441.htm.
[13] Dr. Gregg noted that Plaintiff never took Humira due to a change in her insurance. (R. 833.)

In August 2017, Dr. Gregg completed an arthritis residual functional capacity ("RFC") questionnaire. Dr. Gregg indicated Plaintiff's symptoms and signs included joint pain and fatigue; reduced range of motion in her hands, shoulders and knees; joint deformity; joint warmth; and reduced grip strength. (R. 774.) Dr. Gregg opined that due to the severity of these symptoms, Plaintiff could only sit or stand for about 20 minutes at one time and four hours total in an eight-hour workday, and she required the ability to shift positions at will and to take two to three unscheduled breaks per day for 20 minutes at a time. (R. 775.) Dr. Gregg also determined Plaintiff could lift a maximum of 10 pounds occasionally, and she could only use her hands, fingers and arms (including reaching, grasping, turning, twisting and fine finger manipulations) for 20 percent of the workday. (R. 776.) Dr. Gregg further opined Plaintiff would likely be absent from work more than four days per month due to her impairments or treatment. (*Id.*)

## II. Evidentiary Hearing

At her December 5, 2017 hearing before the ALJ, Plaintiff testified that she had trouble using her hands and standing due to pain and tingling from diabetic neuropathy and arthritis. (R. 46, 49.) She said her conditions had worsened in the past year despite taking multiple medications. (R. 47.) Due to pain in her upper extremities, Plaintiff could do housework for only a few minutes at a time, she used gel pads on her steering wheel and a battery toothbrush with a fat handle, and she kept her hair short because it hurt to wash and brush her hair. (R. 47-50.) She testified that her hands also swelled a lot, and Dr. Gregg had prescribed Naprosyn for swelling and pain. (R. 52.)

Gilberto Munoz, M.D., board-certified in family practice and occupational medicine, testified next as an independent medical expert ("ME").[14] (R. 39.) The ME opined Plaintiff could perform sedentary work and frequently engage in gross handling and occasionally engage in fine

---

[14] The Court's summary of the ME's testimony was pieced together despite several gaps where the transcript referred to the ME's testimony as "[inaudible]." (R. 53-57.)

7

manipulation. (R. 56-57.) The ME stated that his opinion on Plaintiff's handling and fingering abilities was "controversial" because Plaintiff had pain and a diagnosis of CTS. (R. 53-55.) However, the ME found Plaintiff "hasn't been complying with medicine," and he said he could not find the results of an EMG showing objective signs of CTS. (R. 54-55.) The ME also noted that Plaintiff had peripheral neuropathy and "acute on chronic L5," but he was not sure about the neuropathy diagnosis, stating: "I don't know what that is." (R. 56.)

The ALJ then provided the vocational expert ("VE") with a hypothetical person who could perform sedentary work, limited to frequent gross manipulation and occasional fine manipulation. (R. 58.) The VE testified that person could not perform Plaintiff's past work, but that two sedentary unskilled jobs were available in the national economy, even if Plaintiff was further limited to occasional gross manipulation. (R. 58-59.)

## III. ALJ's Decision

On February 15, 2018, the ALJ issued an opinion finding Plaintiff was not disabled within the meaning of the Social Security Act from her alleged onset date of April 12, 2014 through the date of the decision. (R. 20.) The ALJ determined Plaintiff had the severe impairments of rheumatoid arthritis, type II diabetes, lumbar degenerative disc disease, peripheral neuropathy, CTS, morbid obesity, gout and hypertension, but that Plaintiff's impairments, alone or in combination, did not meet a listing.[15] (R. 22-23.) In making this determination, the ALJ found Plaintiff "continue[d] to perform fine and gross movements effectively" and "physical examinations indicate that [she] generally retains full motor strength in her extremities, intact sensation, the ability [to] move all extremities spontaneously, and a normal gait." (R. 24.)

---

[15] Plaintiff does not contest the ALJ's finding that her mental impairments were not severe, so we do not address them.

The ALJ agreed with the ME's assessment at the hearing and assigned Plaintiff an RFC to perform sedentary work, limited to frequent gross manipulation and occasional fine manipulation. (R. 26.) The ALJ stated that this RFC "account[ed] for" evidence from physical examinations that Plaintiff had decreased sensation in her upper and lower extremities, wrist pain, tenderness in her hands and decreased grip strength. (R. 27-28.)

The ALJ found Plaintiff's statements on the intensity, persistence and limiting effects of her symptoms were not "entirely consistent" with the record, pointing to physical examinations from January 2015, May through December 2015, and May 2017 which the ALJ determined "generally indicate[d] that the functioning of [Plaintiff's] extremities remains preserved" with "full motor strength." (R. 26-28.) In addition, the ALJ found that medical reports showed Plaintiff's impairments "responded positively to treatment," including a September 2015 report noting marked improvement in Plaintiff's rheumatoid arthritis symptoms, a November 2016 report indicating Plaintiff's hands and wrists showed no erosive arthropathy (an inflammatory form of arthritis), a February 2017 report noting Plaintiff's arthritis was controlled with medication, and an April 2017 report that Plaintiff's diabetes medication was beginning to work. (R. 27.) The ALJ also found that Plaintiff's diagnosis of moderate to severe CTS and acute on chronic radiculopathy improved after her left carpal tunnel release in April 2016. (R. 27-28.)

The ALJ's opinion stated that the ALJ gave "little weight" to Dr. Gregg's opinion that Plaintiff could sit for 20 minutes at a time and four hours total in an eight-hour workday, lift a maximum of 10 pounds occasionally, and reach, grasp, turn, twist, and perform fine manipulations for 20 percent of the day. (R. 28.) In addition, the ALJ gave little weight to Dr. Gregg's opinion that Plaintiff would need to walk around every 20 minutes for 10 minutes, take unscheduled breaks two to three times a day for 20 minutes, shift positions, and be absent from work more than four

9

days a month. (*Id.*) The ALJ found "[t]hese limitations are extreme and out of proportion" to "the medical record as a whole [which] indicates that [Plaintiff] retains full motor strength of 5/5 in all extremities, full range of motion in her hips and back with symmetric reflexes, a normal gait, and intact sensation." (R. 28-29.) On the other hand, the ALJ gave "great weight" to Dr. Gregg's opinion that Plaintiff could stand for 20 minutes at a time and stand or walk for four hours total in a workday, finding these limitations consistent with the evidence. (R. 29.)

The ALJ then stated that he gave the ME's opinion "great weight for the reasons discussed under Dr. Gregg" and "partial weight" to the state agency opinion limiting Plaintiff to light work with frequent gross and occasional fine manipulation. (R. 29.) The ALJ concluded that Plaintiff would be unable to perform her past relevant work as a cashier, but that jobs existed in significant numbers in the national economy that Plaintiff could perform, as identified by the VE. (R. 29-31.)

## IV. Analysis

The Court's review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). The ALJ's decision will be upheld "if it is supported by substantial evidence—evidence a reasonable mind might accept as adequate to support a conclusion." *Lothridge v. Saul*, 984 F.3d 1227 (7th Cir. 2021) "An ALJ need not address every piece of evidence," but must "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). Plaintiff here raises several arguments for remand. The Court agrees with Plaintiff that the following issues require us to reverse and remand the ALJ's opinion.

### A. Inadequate Assessment of Dr. Gregg's RFC Opinion

The ALJ gave little weight to Dr. Gregg's opinion (except for the portion opining on Plaintiff's ability to stand), because the ALJ found the limitations in the opinion were "extreme

10

and out of proportion" to the medical record. (R. 28.) Because Plaintiff filed her benefits applications before March 27, 2017, the "treating physician rule" applies, whereby ALJs will give "controlling weight" to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2)). If the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider the following factors in deciding what weight to give the opinion: the length, nature and extent of the treatment relationship, the frequency of examination, the supportability and consistency of the medical opinion with the record, and the physician's specialization. *Id.* § at 404.1527(c)(2)(i)-(ii) and (c)(3)-(5). Under the treating physician rule, an ALJ's failure to sufficiently address the relevant regulatory considerations in declining to afford a treating physician opinion controlling weight requires remand. *Reinaas v. Saul*, 953 F.3d 461, 465-66 (7th Cir. 2020).

The ALJ did not adequately consider these factors here. Before assigning Dr. Gregg's opinion little weight, the ALJ did not appear to consider (1) that Dr. Gregg was a specialist in rheumatology who opined that rheumatoid arthritis would keep Plaintiff from working full-time, or (2) that Dr. Gregg had treated Plaintiff regularly since November 2016, more than a year before the hearing. In addition, the ALJ's analysis of the supportability and consistency of Dr. Gregg's opinion with the record was lacking. The ALJ found Dr. Gregg's opinion was inconsistent with portions of the medical record that showed that Plaintiff had full motor strength in her extremities, full range of motion in her hips and back and normal gait, and that despite pain, numbness and tingling, Plaintiff could perform fine and gross movements "effectively." (R. 24.) However, the ALJ's analysis ignored or glossed over the far greater portion of the medical record showing consistent reports and findings of pain and decreased sensation and strength. "An ALJ cannot

11

simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Reinaas*, 953 F.3d at 466.

Perhaps most tellingly, despite the ALJ's findings that Plaintiff's impairments "responded positively to treatment" and that her symptoms improved after her left carpal tunnel release surgery (R. 27-28), the ALJ did not account for the record evidence showing that this improvement was only temporary. Plaintiff eventually had to undergo right carpal tunnel release surgery as well, and even after both surgeries, Dr. Gregg's examinations showed Plaintiff continued to have pain, numbness and tingling in her fingers and decreased flexion, extension and grip in her hands and wrists. The ALJ selectively "emphasized that [Plaintiff] had 'good responses' to surgeries, physical therapy, and medication when the medical records actually show that these treatments were ineffective at either consistently or decisively improving [Plaintiff's] pain or resolving [her] functional limitations." *Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018). In addition, the "unchanged diagnoses and the medication adjustments" Plaintiff's physicians made to attempt to address her symptoms "belie the conclusion that [her] . . . health had improved." *See Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (remanding where the ALJ "fixated on select portions" of examinations in the record). As such, the ALJ's analysis of Dr. Gregg's opinion was not supported by substantial evidence.

### B. Inadequate Assessment of the Medical Expert's Testimony

After dismissing Dr. Gregg's opinion, the ALJ adopted the ME's opinion, giving it "great weight for the reasons discussed under Dr. Gregg." (R. 29.) "An ALJ may have a medical expert assist with interpreting the record evidence," but before assigning "great weight" to an ME's testimony, the ALJ must consider "the factors the regulations identify for assessing medical opinions" under 20 C.F.R. § 404.1527(c), including that the ME has not examined or treated the

12

claimant and whether the ME's specialty is related to the medical impairments at issue. *Plessinger v. Berryhill*, 900 F.3d 909, 914-15 (7th Cir. 2018). The ALJ should also "point to corroborating record evidence" before according the ME's opinion great weight. *Id*. at 915.

The ALJ did none of these things here. Although the ALJ, in giving the ME's opinion great weight, purported to rely on "the reasons discussed under Dr. Gregg," these reasons did not provide substantial evidence to give Dr. Gregg's opinion little weight and they are likewise inadequate to support the ALJ's decision to give the ME's testimony great weight. The ALJ failed to address the fact that the ME never examined Plaintiff, had no treating relationship with her and had no expertise in rheumatoid arthritis. Moreover, the cherry-picked evidence that the ALJ believed was inconsistent with Dr. Gregg's opinion does not provide sufficient corroboration for the ME's opinion. These errors require remand.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for remand (D.E. 16) and denies the Commissioner's motion to affirm. (D.E. 24.)

                                      **ENTER:**

                                      **GABRIEL A. FUENTES**
                                      **United States Magistrate Judge**

**DATED: February 9, 2021**

13